## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 07-80829-Civ-Ryskamp/Vitunac

DONALD HAMM, ELLIOT COOK,
RONALD SIMMS, MARK WAGNER,
MARTHA HARRIS, and TIMOTHY
BRIDGES, individually and on behalf
of persons similarly situated,

Plaintiffs,

vs.



FILED by_____ D.C.

DEC 3 0 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

TBC CORPORATION, a Delaware
corporation, and TIRE KINGDOM, INC.,
a Florida corporation,

Defendants.
_____/

## REPORT AND RECOMMENDATION

This Cause is before the Court on Order of Reference (DE 114), filed July 21, 2008,

from United States District Judge Kenneth L. Ryskamp "for a hearing . . . and decision on

defendants' motion for sanctions **[DE 58]**." Before the Court is Defendants' Motion for

Sanctions Against the Shavitz Law Group for Directly Soliciting Putative Class Members

(DE 58), filed December 28, 2007. Plaintiff filed a Response (DE 66) on January 17, 2008.

Defendants filed a Reply (DE 71) on January 28, 2008. The Court held an evidentiary

hearing on July 31, 2008. The matter is ripe for review.

### BACKGROUND

Plaintiffs, a group of workers employed by Defendant corporations, brought this

case as a proposed collective action to recover unpaid overtime compensation from

1

Defendants under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219 (DE 5). The action is in its earliest stages, and has not yet been conditionally certified. Plaintiffs filed a Motion to Authorize Notice to Potential Class Members (DE 46) on November 28, 2007, which states that in addition to the six named Plaintiffs, twenty-four individuals had opted in to the collective action as of that date.

On December 28, 2007, Defendants filed their Motion seeking court-imposed sanctions against Plaintiffs' counsel, the Shavitz Law Group (SLG), for direct solicitation of putative class members in violation of the Rules Regulating the Florida Bar (DE 58). After the parties fully briefed the issue, the Court heard oral argument on February 8, 2008 (DE 91). On March 11, 2008, this Court stayed the litigation so that the Florida Bar could investigate Defendants' claims (DE 109). On July 9, 2008, the Florida Bar informed the Court that it declined to review the charges or make any determination on the merits based on Rule 15.55 of the Rules Regulating the Florida Bar, which states that the Bar should stay any investigation if a court has concurrent jurisdiction over the matter (DE 113). Based upon this information, the Court denied Plaintiffs' Motion to Lift Stay and Reopen Case (DE 110) in order for the Court to first issue a ruling on Defendants' Motion for Sanctions. The Court indicated that "[u]pon resolution of that motion, the Court will lift the stay and continue the litigation" (DE 113).

## PARTIES' CONTENTIONS

### Defendant's Written Motion for Sanctions

Defendants allege that SLG violated Southern District Local Rule 11.1.C and Florida Rule of Professional Conduct 4-7.4(a) by soliciting at least four employees of Defendant

2

Tire Kingdom[1] (TK). Defendants claim that on the morning of Saturday, December 15, 2007, an SLG employee called the personal cellular phones of three current TK employees and one former TK employee living in Missouri. One employee, Shane Cook, stated that the woman caller "identified herself as working for an attorney for some plaintiffs who were suing [TK]" and that they "had gotten [his] name and number from a former employee." According to Cook, after she explained that the suit was for unpaid overtime owed to employees who worked during their lunch breaks, she asked if he "would like to join the lawsuit and 'recover the money that [TK] owes [him].'" Cook's response was to tell her he "thought the allegations were 'bull****,' as...no one is ever forced to work through their breaks."

A second employee, Nick Kilgore, said the woman caller "identified herself as working for a Florida attorney's office handling a lawsuit that a number of [TK] employees had filed." According to Kilgore, after she explained that the suit "concerned claims that employees were working through their lunch breaks and not being paid for them," she asked if he "would be interested in joining the lawsuit in order to 'recover [his] lost pay.'" Kilgore told the caller he "was not interested in suing anyone, particularly since [he] did not believe the claims against [TK] were true." Defendants claim that these two employees, together with a third current employee, Victor Harris, and a fourth former employee, Matt Bidner,[2] reported the phone calls to TK Store Manager Chris Blum the next day. Blum

---

[1] The record and hearing transcript also contains references to National Tire & Battery, or "NTB", also a division of TBC Corporation.

[2] Defendants did not submit declarations of Victor Harris or Matt Bitner. Store Manager Chris Blum's declaration indicated that these two employees reported receiving phone calls similar to those described by Cook and Kilgore.

reported the calls to his Area Director, who then contacted Defendants' counsel.

Defendants contend that the sole purpose of the calls was to directly solicit Cook and Kilgore to join as members of the putative class in violation of Rule 4-7.4. Defendants point to Plaintiffs' proposed notice, filed as part of their Motion to Authorize Notice, as evidence that SLG's solicitation was for pecuniary gain in that the notice does not inform potential class members that they may contact counsel of their own choice or choose to opt-out and pursue their own action. Instead, the notice indicates that a putative class member must contact and agree to retain SLG in order to join the litigation. Defendants also argue that SLG's placement of the calls ten days before Christmas, a time when people focus on holiday debt, evidences an intent to solicit individuals at a time when they have "'impaired capacity for reason, judgment, and protective self-interest,' which Rule 4-7.4(a) was designed to protect against." Defendants argue that there is no way to know if SLG has solicited other putative class members and whether any of the named Plaintiffs or opt-in Plaintiffs were joined in the suit as the result of improper solicitations by SLG.

By way of relief, Defendants ask this Court to (1) issue an injunction barring SLG from further contact with any potential class member to enjoin SLG from soliciting, entering an agreement for, charging, or collecting a fee for employment from any potential class member from this date forward, (2) compel SLG to produce for in camera review all documents relating to any communications between SLG and all current Plaintiffs, opt-in Plaintiffs, or prospective class member, (3) prohibit SLG from contacting putative class members in any manner other than Court approved written notice, (4) require SLG to provide Defendants with name and contact information for any putative class members they contacted and permit Defendants to depose them regarding solely these

4

communications separate and apart from the ten-deposition limit, and (5) require SLG to reimburse Defendants for fees and costs for bringing the instant Motion.

## Plaintiffs' Response

Plaintiffs agree that SLG assigned administrative assistant Tayara Oliveira to call Cook, Kilgore, and Harris the morning of December 15, 2007, but disagree with Defendants' version of her communications with them. According to Plaintiffs, Oliveira contacted these employees as a follow up on potential witnesses identified by an existing client "to corroborate [that client's] claim for overtime violations" and "as part of investigating the client's claim." To support this claim, Plaintiffs rely on two pages of a fourteen-page fax filed under seal. The fax, dated December 13, 2007, is addressed to Tayara Oliveira from Matthew C. Bitner with a reference line of "Nation Tire & Battery." The second page states "Other NTB employees" with a list of six names, including Kilgore, Cook, and Harris, and their phone numbers. The other three names on the list are redacted.

Plaintiffs deny anyone at SLG's office asking Cook or Kilgore if they wanted to recover money owed to them. According to Oliveira's declaration, during her call to Cook, she "explained that we are a law firm representing workers in NTB stores who were not paid overtime...[stated] that one client had provided [Cook's] name as a possible witness to overtime deductions...[and] asked him if he had any knowledge of that problem." She stated that Cook's "immediate response was to say that it never happened and that people were making it up" before launching "into a stream of profanity" after which she ended the call. She stated that Cook "immediately called back...the call was answered by my co-worker Adriana Castrillon-McNish" and that he "again started with a stream of profanity,

5

and [McNish] ended the call and alerted [Oliveira] to the situation." According to Oliveira, Cook called a third time and "again resorted to profanity," so she ended the call and ignored a fourth call reflecting Cook's number on the caller ID. Oliveira maintains that she had the same conversation with Kilgore as with Cook and that Kilgore's "immediate response was to deny any problem." Plaintiffs submitted declarations by administrative assistants Oliveira and McNish to support their version of the communications that occurred that Saturday morning.

Plaintiffs argue that there is no proof of any solicitation by SLG; all that occurred was a brief attempt to contact potential witnesses identified by an existing client. Plaintiffs further claim that Oliveira's calls reflect SLG's efforts to comply with their Rule 11 duty to duly and diligently investigate their clients' case. Moreover, Plaintiffs claim that Oliveira properly disclosed SLG's role as counsel to a group of workers claiming unpaid overtime from the start of each call and immediately ended the calls when Cook and Kilgore denied witnessing any overtime compensation problems.

## Defendants' Reply[3]

Defendants argue that SLG's response reveals their failure to abide by Rule 11 and Florida Bar Rules in that administrative assistants with no legal training were purportedly conducting Rule 11 due diligence investigations regarding claims of SLG clients rather than

---

[3] On February 3, 2008, Plaintiffs filed a Motion for Leave to File Surreply (DE 76) claiming that Defendants' Reply inserted a new theory of inadequate claims investigation in the "4 pages of new argument under Rule 11 that Defendants introduced for the first time in their Reply." (DE 76). In an Endorsed Order (DE 87), filed February 7, 2008, the Court denied this motion and indicated that to "the extent that this Court determines that Defendants made new arguments in its reply, this Court will refuse to consider those arguments when rendering a decision."

6

attorneys. Defendants further argue that the document filed under seal is "grossly incomplete" in that it is only two pages of a fourteen page fax with no mention of why the six names and numbers were provided, nor any indication that the individuals listed were potential witnesses. Defendants suggest that the other twelve pages of the fax not provided by Plaintiffs may reveal why the names and contact numbers were provided to SLG. Defendants also suggest that the three redacted names may represent individuals who could corroborate Cook and Kilgore's claims of solicitation. Defendants question why SLG did not produce telephone records to confirm their version of the communications. Attached to the Reply was Cook's cellular phone records, which confirm that Cook received a two-minute phone call from SLG at 10:31 a.m. on December 15, 2007. The records also show that Cook placed an outgoing one-minute phone call to SLG at 10:51 a.m. Defendants explain that Cook called SLG "to sarcastically inquire into the possibility of" suing SLG. Defendants end by characterizing the declarations of Oliveira and McNish as self-serving and not credible.

On February 4, 2008, Defendants filed a declaration of TK employee Christopher Johnson (DE 81-2), a Kansas resident, stating that he received a call from SLG in mid-November, 2007. According to Johnson's declaration, the woman caller explained that the suit was due to Defendant corporation's "taking money from people by not paying them for the time when they had to work through lunches" and that their firm "would love to help [him] recover [his] money." After learning Johnson was not interested, the caller allegedly "asked if [he] knew of any coworkers...who may want to get their money back."

## FEBRUARY 8, 2008 HEARING

The Court held oral argument on February 8, 2008. As part of their argument,

7

Defendants noted that the six named Plaintiffs are from Florida, Georgia, North Carolina and Pennsylvania while during the time between the filing of the Complaint and the hearing, 40 individuals from Texas, Louisiana, Alabama, Ohio, Maryland, Missouri, Massachusetts and Illinois had consented to opt in to the suit. Defendants argued that the reason these individuals with no apparent connection to the named Plaintiffs joined the suit was due to unethical solicitation by SLG. Defendants went on to reiterate their version of the communications that took place according to the sworn declarations of Cook, Kilgore, and Johnson. Plaintiffs responded that all of the individuals who opted in to the suit voluntarily came forward and that SLG's administrative assistants were merely placing calls to investigate potential witness testimony.

The Court noted its failure "to see how the people of Kansas and Missouri are going to help substantiate a situation at a local store here in Florida." After hearing from both sides, the Court described Defendants' claims as "serious charges" and noted that a review of the number of cases filed by SLG since 2000 that never reached trial is indicative of "nuisance type claims that get bought off." The Court indicated that a resolution of the issues raised, issues that caused concern to the Court, would require determinations regarding credibility and the "clear factual issue" of whether the Defendants' employees were solicited or not.

## JULY 31, 2008 EVIDENTIARY HEARING

### Nick Kilgore

The court held an evidentiary hearing on July 31, 2008. Nick Kilgore testified for the defense. Kilgore had worked at a NTB store in Kansas City, Missouri for a year and a half,

8

first as a sales associate and then as a retail manager. (T.21).[4] Kilgore testified, consistent with his written declaration, that he was called on the morning of December 15, 2007, by a woman who identified herself as being from a law firm. (T.22). Kilgore remembered that she had an unusual name that he could not pronounce. The caller stated that SLG had received Kilgore's phone number from former employee Matt Bitner and that SLG wanted to know if Kilgore was interested in joining the suit. (T.22). Kilgore recalled that the caller stated the suit "was for unpaid lunch breaks or employees being forced to work through the lunch break" and the caller "wanted to know if [he] was interested in recovering some of [his] lost money." (T.22). Kilgore informed the caller he was not interested in joining the suit and had never been forced to work through a lunch break. Kilgore called his boss, Christopher Blum, and informed him of the call. (T.24).

According to Kilgore, the caller never asked if Kilgore witnessed Bitner or any other TK employees being forced to work through lunch breaks. (T.23). Kilgore admitted that although his declaration states that the phone call lasted approximately five minutes, the call actually lasted only about one minute. (T.25). Kilgore attributed the discrepancy to the fact that he made his declaration four to six weeks after the call occurred. Since making his declaration, Kilgore obtained and viewed his phone records showing the duration of the call being shorter than he originally remembered. (T.30).

On cross-examination, Plaintiff's counsel asked Kilgore if the suit about which he was contacted "had to do with overtime issues." (T.37). Kilgore corrected counsel's statement and stated: "She didn't say overtime issues, she said that it was due to people

[4]All references to the transcript (DE 130) of the Evidentiary Hearing are cited as (T.___).

9

being forced to work through the lunch break or not being paid for the lunch break." (T.37). He again stated that the caller told him Matt Bitner had identified him as a possible interested party in the suit. (T.37). According to Kilgore, the caller never asked him if he knew or had worked with Matt Bitner. (T.38). Kilgore had previously worked with Matt Bitner when they were both sales associates. (T.38). Kilgore stated that the caller did not go into details about the allegations of the suit, and that "her main interest was wondering if I wanted to join." (T.39).

## Chris Johnson

Chris Johnson testified for the Defendants. Johnson worked for NTB for three years, first as a tire technician and later as a sales representative. (T.42). Johnson worked at NTB's stores in Overland Park, Kansas; Shawnee Mission, Missouri; and Kansas City, Missouri. (T.43). Johnson's employment with NTB was interrupted by a fourteen-month break during which he served on active duty with the U.S. Army in Iraq. (T.43). Johnson later left NTB to work for Citibank as a customer service sales representative. (T.41).

Johnson testified that he received a call on December 7, 2007, from a caller who identified herself as working in a law office. (T.44). According to Johnson, the caller told him "about a lawsuit that's being brought up against NTB involving lost wages for certain employees" and that the caller "asked me if I felt I had any lost wages, if I'd like to be a part of that particular lawsuit." (T.45). Johnson told her he was not interested. The caller asked if Johnson knew anyone else who had lost wages. Johnson told the caller he would keep the number and get back to her if he lost any wages. He saved the number in his cellular phone. (T.45).

10

Johnson stated that the caller never asked if he had ever been forced to work off the clock, or if he had ever witnessed anyone else forced to work off the clock. (T.46). The caller did not mention any other NTB employee, nor did she mention how she obtained Johnson's number. (T.46). Johnson mentioned the call to his service manager the following day at work, who told him not to worry about it. (T.46). When Johnson later transferred to the Kansas City store, he overheard two other employees, Shane Cook and Chris Blum, talking about the suit against NTB. (T.47). Johnson informed them of the call he had received. (T.47). Johnson testified that while his declaration stated that he was called on November 7, 2007, the call actually happened December 7, 2007 and Johnson had confused the timing. (T.47). Johnson never knew Matt Bitner and never worked with him. (T.49). Johnson did not know any of the named Plaintiffs in the suit against NTB.

Shane Cook

Shane Cook testified for the Defendants. Cook had been a mechanic for NTB for almost three years at the Kansas City store. (T.53-54). Cook testified that he received a call on December 15, 2007 from a law firm asking "if [he] would like to join a lawsuit for people that had basically been forced to work through lunch or forced to work through overtime and not being paid for it." (T.54). The caller told him that "Matt Bitner had given them [his] name saying [he] might be interested in joining." (T.55). Cook told her he thought the allegations were "B.S." and that he was not interested in joining the suit. (T.55).

According to Cook, the caller did not ask if he had witnessed Matt Bitner or any other employee being forced to work through lunch, or if Cook had been forced to work through lunch himself. (T.56). The call lasted under a minute. After the call ended, Cook

11

told his store manager, Chris Blum, about the call. (T.56). Cook stated that he later used his cellular phone to call the law firm back and ask them if they would like to join a suit he was bringing because SLG was filing frivolous suits. (T.56). Cook stated that he "quite often" makes such callbacks for his own entertainment "when [he is] solicited." (T.56). Cook admitted to having used profanity during the phone call he received, and that it is part of his everyday way of talking. (T.57). Cook stated that he knew Matt Bitner as a co-worker at the store. (T.58). Cook did not know any of the named Plaintiffs in the suit against NTB. (T.59).

On cross-examination, Cook offered the same recollection of what occurred during the phone call with the woman from SLG that he had given on direct examination. (T.62). Cook stated that he did not tell the caller that TK owed him money, but that the caller told Cook that TK owed him money. (T.62). Cook elaborated that "it was almost like a sales pitch to me" and "it was basically if I'd like to join the lawsuit to recover monies that was owed to me." (T.63). Cook stated that he did not mention calling the law firm back in his first declaration because he had not remembered doing it at the time he made his first declaration.[5] (T.65).

## Christopher Blum

Christopher Blum testified for the Defendants. Blum was employed by NTB for two years, as a sales associate, an assistant manager, a store manager, and most recently a service manager. Blum was the manager at Store 676 in Kansas City. (T.70). On December 15, 2007, Blum received a call from Nick Kilgore informing him that a former

---

[5]Defendants filed a "Second Declaration of Shane Cook" (DE 71-2), addressing the callback issue.

12

employee, Matt Bitner, was suing his store. Blum knew Bitner well as a former employee. (T.71). Blum stated that other employees in his store informed him that they had received calls from the same phone number regarding the same issue as that reported by Kilgore. Chris Johnson came forward later when he heard Blum, Kilgore, and Cook discussing the case.

## Gregg Shavitz

Gregg Shavitz of the Shavitz Law Group testified for the Plaintiff. Shavitz testified that SLG does labor and employment law with a concentration on wage and hour law. The firm almost always represents plaintiffs. At the time of the hearing, the firm employed approximately six attorneys and eleven non-attorneys. (T.84). Shavitz testified that in this case there were already thirty plaintiffs in the case, and nothing to be gained by adding three or five to that number. (T.92). Shavitz testified that current or former TK employees would be the best source of information about whether people regularly worked through lunch breaks in the region in which they worked. (T.94). Shavitz stated that the common way to identify witnesses to substantiate claims is for SLG clients to identify other employees who could support their testimony. (T.94). Shavitz stated that Kilgore, Cook, and Johnson could not have become part of the case against TK because they were ineligible. (T.97).

Shavitz testified that SLG provides training for its employees on how to call prospective witnesses about a case. (T.98). Shavitz described how a larger case such as this one would have a paralegal and an administrative assistant assigned to it. (T.98). An administrative assistant will "already have been with the firm for some period of time in which they'll have received incoming calls and then get comfortable in speaking to clients

13

and going through a script or an incoming call situation about one calling about a new case." (T.99). According to Shavitz, the administrative assistant on a particular case would have attended many meetings in which the allegations in that case were discussed. If the administrative assistant was asked to call potential witnesses, the attorney on the case would describe "with particularity the information that is being sought on the call." (T.99). Shavitz has provided training by discussing solicitation at monthly firm meetings and circulating articles on solicitation from the Bar Journal and other sources. (T.100).

On cross-examination, Shavitz stated that any time an administrative assistant is put on a case, he or she is reminded not to solicit. Shavitz estimated that Tayara Oliveira had approximately ten cases during her time at SLG that would have triggered such training. (T.107). Shavitz admitted that SLG does not have a written policy on solicitation. (T.107). He sends an e-mail with an article attached to the firm. (T.107). Sometimes SLG gives administrative assistants a script to work from when they make calls. (T.108). Tayara Oliveira did not have such a script in this case. (T.108). There was no attorney or paralegal sitting with Oliveira when she called Christopher Johnson, Nick Kilgore, and Shane Cook on December 7, 2007. (T.109).

Shavitz also stated that he did not know if SLG called the third parties to corroborate the allegations made by the named plaintiffs in the suit before filing the Complaint. (T.114). Shavitz admitted that contrary to his earlier testimony, Christopher Johnson would be a potential plaintiff in the case based upon his position with TK. (T.122). Shavitz also stated that Nick Kilgore would be a potential plaintiff but SLG would not wish to represent him in order to avoid conflicts because Kilgore had since become a manager. (T.123). Shavitz stated that the questions an administrative assistant calling a potential witness might ask

14

could be anything, depending on the attorney who directed him or her to make the call. (T.124). The administrative assistant may or may not know the position currently or formerly held by the potential witness. (T.125).

Shavitz admitted that the form of notice that SLG attached to its motion for class notice in this case did not advise potential plaintiffs that they could seek other counsel besides SLG. (T.132). In response to the Court's questions, Shavitz stated he did not give Oliveira a script to follow in this case because the issue was fairly narrow and Oliveira was already familiar with the issues in the case. (T.138). Shavitz also stated that neither he nor SLG attorney Hal Anderson was supervising Oliveira by telling her what to ask and what not to ask potential witnesses in her calls. (T.141). The administrative assistant would only e-mail Shavitz or Anderson if he or she had something specifically to share with them. (T.141). Shavitz did not recall if Oliveira had done so in this particular case. (T.146).

Shavitz stated that if an administrative assistant informed him that a potential witness was interested in joining the suit as a plaintiff, Shavitz would express that he hoped the witness had expressed interest to SLG rather than the administrative assistant reaching out to the potential plaintiff. (T.144). Shavitz did not know if he was the attorney who directed Oliveira to make the calls to Johnson, Cook, and Kilgore. (T.145). Shavitz testified that his administrative assistants don't solicit, "based upon their training, based upon their understanding of the Bar rules and there's no advantage to the case to do so." (T.146). Shavitz admitted that if more plaintiffs opted-in to a FLSA collective action, SLG would spend more attorney time supplementing disclosures under Rule 26(a)(1), for which they would seek reimbursement at the end of the case if they won. (T.149).

15

Tayara Oliveira

Tayara Oliveira testified for the Plaintiff. She was in her second year of college at the time of the hearing and had been an administrative assistant at SLG since October 2006. (T.151). She does not possess a law degree or paralegal certification. (T.171). Oliveira testified that her duties include making calls to witnesses, speaking with clients, and assisting incoming callers. (T.153). Oliveira was assigned to this case. (T.154). She made calls to witnesses to obtain information about SLG's clients' claims. (T.154). Oliveira stated that Gregg Shavitz offered SLG employees "extensive training" about what they could not say in phone calls, and that SLG educated them about other firms that had experienced issues with solicitation. (T.154). Oliveira testified that they were told not to solicit at any point in time by asking people to join the case. (T.156).

Oliveira stated that on December 15, 2007, she was calling people that SLG client Matthew Bitner had identified. (T.157). Bitner had faxed a typed list of names and telephone numbers to SLG. (T.158). The list included the names of Nick Kilgore, Shane Cook, and Victor Harris. (T.163). Oliveira testified she called Cook and Harris with the intention of getting information about SLG's clients' claims, and not to entice them to join the case as plaintiffs. (T.164).

Oliveira's stated recollection of the phone conversation with Cook differed from Cook's recollection. According to Oliveira, she explained who she was and explained that Bitner had provided SLG with Cook's name and number, and told SLG that Cook might have information to substantiate Bitner's claims. (T.164). Oliveira claimed she did not get far because Cook launched into a stream of profanity regarding the case and she ended the call. (T.165). Oliveira maintained that at no time did she inquire whether Cook was

16

interested in joining the suit or urge him to do so. (T.165). Oliveira stated she did not get as far as asking Cook his position with TK before she ended the call. (T.164). Someone called SLG back, and Adrienne Castrillon-McNish answered the call and said it was someone yelling and cursing. (T.165). Another call came in, but Oliveira and Castrillon-McNish did not answer it, believing it was Cook again. (T.165).

Oliveira also called Nick Kilgore the same day. She testified that she began the call the same way she did her call to Shane Cook. (T.166). Oliveira's testimony also conflicts with Kilgore's. Oliveira testified that she informed Kilgore that Matthew Bitner provided Kilgore's name and number to provide SLG information regarding Bitner's claims. (T.166). Kilgore stated he did not have information and was not interested in speaking with Oliveira at that time, and ended the call. (T.166). Again, Oliveira stated she never asked Kilgore whether he was interested in joining the suit. (T.166). She never asked him whether he ever experienced any wrongful deduction of pay. (T.166). Oliveira had no recollection of ever speaking with Christopher Johnson.

On cross-examination, Oliveira stated that SLG later provided her a written script to follow when making calls. (T.172). Oliveira testified that she could not recall exactly when SLG provided her the script, only that it was after her calls to Kilgore, Cook, and Johnson. (T.172). She testified that she has never seen the Florida Bar rule on solicitation. (T.172). Oliveira did not recall contacting a number of the opt-in plaintiffs in the case from other states, and could not say for sure who contacted them. (T.174). She admitted she contacted a plaintiff in Maryland, Lorenzo Ramsay, "to corroborate the lunch deductions issue that other tire technicians suffered while working for Tire Kingdom as a whole." (T.176-77). Oliveira could not recall which specific or potential SLG client's claims

17

she was trying to corroborate by calling Mr. Ramsay. (T.177).

Oliveira stated she did not know what Matt Bitner meant by writing "Other NTB employees" at the top of the fax he sent to Oliveira containing names. (T.181). She admitted that Bitner could have meant other NTB employees who would like to join the suit. (T.181). Oliveira did not recall what names were redacted from the fax or whether they worked with Bitner. (T.182). Oliveira could not recall if she ever spoke to any TK/NTB employee who corroborated Bitner's allegations in the case. (T.188). There was never a lawyer or certified paralegal sitting next to her when she made the calls on this case or any other case for which she made calls to potential witnesses. (T. 190).

Oliveira stated that she or another administrative assistant have regular weekly or bi-weekly meetings with Shavitz. (T.196). Oliveira did not have a training file. (T.197). She did not have a written job description and was not sure if one existed. (T.197). She takes notes when she makes calls to people, on a spreadsheet on the computer. (T.197). She records the information they provide or notes that they did not want to speak to her. (T.198). She was instructed by Gregg Shavitz orally to make the calls in this case. (T.199). There was no one "specifically set up to supervise" her but she was able to go to Shavitz with any questions or concerns. (T.200). If Shavitz was not in the office, she would phone him, email him, or wait a day or two and ask him in person. (T.201).

SLG did not bring supporting materials to the evidentiary hearing regarding the spreadsheets. However, given the seriousness of the allegations against SLG, the Court granted SLG leave to provide supporting materials after the hearing. The Court ordered SLG to provide the Court with the emails regarding the phone calls to the witnesses who were allegedly solicited, its training materials concerning Oliveira, and the fax from Bitner

to Oliveira filed under seal. (T.203). SLG provided the Court the following materials, which

the Court has reviewed[6]:

Exhibit A: "Spreadsheets, Emails, & Notes": This exhibit consists of a spreadsheet that contains, names, phone numbers, addresses, and brief notes of conversations. It also includes several e-mails from Tayara Oliveira to several people confirming conversations.

Exhibit B: "Training Documentation": This exhibit consists of e-mails from Gregg Shavitz to SLG employees and others.

Exhibit C: "Facsimile": This exhibit is the fax from Matthew Bitner to Tayara Oliveira discussed at the July 31, 2008 evidentiary hearing.

On November 18, 2008, the Court ordered (DE 137) the parties to file their final

memoranda of law on Defendant's Motion for Sanctions. Defendants filed their Final

Memorandum of Law (DE 140) in Support of Motion for Sanctions on November 24, 2008.

Plaintiffs filed their Final Memorandum in Opposition (DE 144) on December 9, 2008.

Defendants filed a Reply (DE 145) on December 15, 2008.

## DISCUSSION

The issues before the Court are whether SLG's pre-certification telephone

communications with Defendants' current and former employees constituted improper

solicitation of putative class members and, if so, what sanctions this Court should impose

to address that conduct.

Local Rule 11.1.C states that "[t]he standards of professional conduct of members

of the Bar of this Court shall include the current Rules Regulating the Florida Bar." Rule

4-7.4(a) of the Rules Regulating the Florida Bar prohibits a lawyer from personally soliciting

---

[6] The Court later entered several Orders (DE 131, DE 133, DE 135) that Plaintiffs file the electronically stored information in a manner accessible to the Court and in a manner replicating the originals.

19

professional employment from a prospective client "when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain." This rule prohibits a lawyer from entering into an agreement for a fee, or from collecting a fee, for employment obtained in violation of this solicitation rule.  The rule further states that a lawyer shall not permit his or her employees or agents to solicit on the lawyer's behalf. The commentary to the rule notes the "potential for abuse inherent in direct solicitation by a lawyer of prospective clients known to need legal services" in that such clients often feel "overwhelmed by the situation giving rise to the need for legal services and may have an impaired capacity for reason, judgment, and protective self-interest."

Rule 4-5.3 of the Rules Regulating the Florida Bar addresses lawyer liability for the conduct of their nonlawyer assistants.  Under this rule, any lawyer having "direct supervisory authority" over nonlegal staff is responsible for making "reasonable efforts" to ensure that the nonlawyer's conduct is consistent with the attorney's own professional obligations. An opinion by the Professional Ethics Committee of the Florida Bar explains that Rule 4-5.3, among other rules, holds nonlegal staff to the same obligations as lawyers regarding solicitation of new business. Fla. Bar Prof'l Ethics Comm. Op. 89-4 (1989). Therefore, any lawyer who orders or ratifies improper solicitation by a nonlawyer at their firm would be held liable for violation of the Rules of Professional Conduct. Id.

The misconduct alleged by Defendants occurred in the context of pre-certification communications in a proposed collective action. The United States Supreme Court has recognized that while "[c]lass actions serve an important function in our system of civil justice," they also present "opportunities for abuse." Gulf Oil Co. v. Bernard, 452 U.S. 89, 99-100 (1981). The Supreme Court has further recognized that the same unique potential

for abuse inherent in class action suits is also present in collective actions with respect to "misuse of the class device." Hoffman-La Roche Inc. v. Sperling, 493 U.S. 165, 171 (1989) (applying Gulf Oil to collective actions). The potential abuses include "heightened susceptibilities of nonparty class members to solicitation amounting to barratry as well as the increased opportunities of the parties and counsel to 'drum up' participation in the proceeding" and "[u]napproved communications to class members that misrepresent the status or effect of the pending action." Gulf Oil, 452 U.S. at 101 n.12.

After observing all of the testimony at the evidentiary hearing and fully considering the materials submitted by the parties in support of their positions, the Court finds that SLG solicited Nick Kilgore, Shane Cook, and Chris Johnson to join the suit against TK. The Court finds the testimonies of Kilgore, Cook, and Johnson credible in their accounts of the calls they received from SLG. The Court finds, based on their testimonies, that each of these three witnesses received a phone call from SLG in which he was asked if he would like to join the suit against TK or NTB in order to recover money owed to him. Cook and Kilgore specifically recalled the caller informing them that Matt Bitner had provided their names.

The Court further finds that SLG's motive in soliciting Kilgore, Cook, and Johnson was pecuniary gain. The Court specifically finds, based on the testimonies of Cook, Kilgore, and Johnson, that none was asked the kind of "witness-type" questions that would lend credibility to SLG's contention that the purpose of the calls was to gather information to substantiate the claims of existing SLG clients. Gregg Shavitz admitted that the more clients SLG added to the suit, the more work it would perform for which it would later seek compensation if the suit concluded with a result favorable to SLG. The Court finds wholly

21

unpersuasive SLG's argument that it would not attempt to solicit Cook, Johnson, and Kilgore based on their lack of eligibility to participate as plaintiffs due to their positions. Indeed, Shavitz admitted on cross-examination that Kilgore and Johnson were eligible to become part of the suit. However, even assuming that Cook, Kilgore and Johnson were ineligible to join the suit as plaintiffs does not compel the conclusion that they were not solicited.

The Court finds that SLG failed to train its administrative assistant, Tayara Oliveira, regarding solicitation of clients. The Court further finds as to this point, based on the testimony of Oliveira and Gregg Shavitz, that attorneys Gregg Shavitz and Hal Anderson of SLG had direct supervisory authority over Oliveira as a member of SLG's nonlawyer staff. In opening statements at the evidentiary hearing, counsel for SLG stated that Tayara Oliveira would testify "about the extensive training she receives at the Shavitz Law Group to avoid solicitation." (T.16). Oliveira's testimony at the hearing failed to establish the existence of such training, nor did that of Gregg Shavitz. Oliveira admitted that she had never seen the Florida Bar rule on solicitation. Gregg Shavitz testified that SLG does not have a written solicitation policy in place.

The testimonies of Oliveira and Shavitz and the materials submitted by SLG in an effort to show training reveal an attempt by SLG to characterize the loose day-to-day supervision of Oliveira in her duties as something akin to formal training on solicitation. For instance, SLG attempted to establish through Shavitz's testimony that an administrative assistant such as Oliveira would be familiar with the case and in constant contact with a supervising attorney. Even if this were sufficient to show training, Shavitz undermined his earlier testimony when he testified that an administrative assistant such as Oliveira would

22

only contact him "if she has something to share." (T.141).

The Court notes that Shavitz's testimony regarding both training and the specific solicitation alleged in defendants' motion was vague and lacking in detail on important points. Shavitz resorted to generalities in his testimony about what "would happen" and who "will be" supervising the administrative assistants on a given case. Shavitz's ability to state specifically how Oliveira was supervised on this particular case lacked detail. Shavitz could not remember if he was the attorney who directed Oliveira to make the phone calls at issue in this motion. Shavitz did not provide details that would support the assertion that SLG provided Oliveira substantial training on solicitation or that solicitation did not occur in this particular case.

SLG contends the fax that it provided the Court proves that Matt Bitner sent Oliveira the names of potential witnesses. However, the fax does not support SLG's position. The FAX does not contain any notation that it was a list of potential witnesses. Oliveira's spreadsheets similarly fail to contain information that supports SLG's argument that it did not solicit plaintiffs in this case. Additionally, the emails SLG provided to the Court show only that SLG staff was occasionally warned not to solicit. The emails fail to show that SLG ever explained and identified solicitation to its staff and trained them on how to avoid it. The Court finds, based on the testimony at the hearing and the additional materials submitted by SLG, that SLG failed to provide formal, substantial, and informative training to its staff on compliance with the Florida Bar rules on solicitation.

SLG improperly solicited clients in violation of Rules Regulating the Florida Bar. The Court now addresses the appropriate means by which to sanction SLG for its conduct. "It has long been understood that certain implied powers must necessarily result to our Courts

23

of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." Thomas v. Tenneco Packaging Co. Inc., 293 F.3d 1306, 1320 (11th Cir. 2002) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)). These powers include the power of the Court "to discipline attorneys who appear before it." Chambers, 501 U.S. at 43. However, courts are to exercise caution in the exercise of their inherent power, provide the attorney facing sanctions due process, and only impose sanctions where the court finds conduct that amounts to bad faith. Thomas, 293 F.3d at 1320. The Court does not take up the task of imposing sanctions lightly.

"[A] district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." Gulf Oil, 452 U.S. at 100. This "discretion is not unlimited," however, and "an order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." Id. at 101-02. While specific findings of abuses may justify a ban on communications, the mere possibility of abuse does not justify "adoption of a communications ban that interferes with formation of a class or the prosecution of a class action." Id. at 104.

The Court has found specific abuses in the present case that require the imposition of appropriate sanctions. However, the Court is mindful of the disfavor on communication bans expressed by the Supreme Court in Gulf Oil. Furthermore, the Court does not seek to punish SLG's legitimately-obtained clients by hampering SLG's ability to prosecute its case as to those clients through a ban on communication with potential witnesses. The

24

appropriate sanction in the present case prevents SLG from reaping financial benefit from clients obtained by solicitation.

## RECOMMENDATION

For the reasons stated above, this Court respectfully RECOMMENDS to the District Court that the Defendant's Motion for Sanctions (DE 58) be GRANTED IN PART and DENIED IN PART, as follows:

1) that Shavitz Law Group be barred from representing any individual, including any current opt-in plaintiff, who did not work with any of the named plaintiffs in this action: Donald Hamm, Elliot Cook, Ronald Simms, Mark Wagner, Martha Harris, and Timothy Bridges;

2) that Shavitz Law Group be barred from collecting any fees or costs for work performed in representing any individual, including any current opt-in plaintiff, who did not work with any of the named plaintiffs in this action: Donald Hamm, Elliot Cook, Ronald Simms, Mark Wagner, Martha Harris, and Timothy Bridges;

3) that Shavitz Law Group be ordered to formulate and implement a formal written policy on solicitation to inform and govern the conduct of all SLG attorney and non-attorney staff;

4) that a copy of this Report and Recommendation and any Order adopting it be forwarded to the Florida Bar for possible further action;

5) that Shavitz Law Group be ordered to reimburse Defendants for all reasonable fees and costs incurred in bringing and prosecuting Defendants' Motion for Sanctions.

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable United States District Judge Kenneth L. Ryskamp,

within ten (10) days after being served with a copy. See 28 U.S.C. § 636(b)(1)(c). Failure to file timely objections may limit the scope of appellate review of factual findings contained herein. See United States v. Warren, 687 F.2d 347, 348 (11th Cir. 1982) cert. denied, 460 U.S. 1087 (1983).

DONE and SUBMITTED in Chambers at West Palm Beach in the Southern District of Florida, this _____ day of December 2008.

ANN E. VITUNAC
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Honorable Kenneth L. Ryskamp
All counsel of record

26